**James L. Hiller**, OSB #772220
Email: jhiller@hittandhiller.com
Hitt Hiller Monfils Williams LLP
411 SW Second Avenue, Suite 400
Portland, OR 97204
Telephone: 503-228-5973
Facsimile: 503-228-4250

**Louis M Heidelberger**, PA Bar 21569 [Pro Hac Vice Pending]
Email: louis.heidelberger@gmail.com
The Law Offices of Louis M Heidelberger PLLC
Telephone: 215-284-8910
Facsimile: 215-883-9745
*Attorneys for Savannah Intellectual Property LLC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| SAVANNAH INTELLECTUAL PROPERTY LLC, a Pennsylvania Limited Liability Company,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>H2OME CERTIFIED, INC., dba HOME CERTIFIED, INC, an Oregon corporation,<br><br>　　　　　　　　Defendant. | Case No. 3:24-cv-316<br><br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Savannah Intellectual Property LLC ("Savannah") files this Complaint against Defendant H2OME Certified, Inc., dba Home Certified, Inc ("Defendant" or "Home") for patent infringement under 35 U.S.C. § 271, and states as follows:

## THE PARTIES

1.      Savannah is a Pennsylvania Limited Liability Company which maintains its principal place of business at 1229 Laurel Oak LN, York, PA 17403.

2.      Defendant Home is a corporation organized and existing under the laws of the State of Oregon, and maintains its principal place of business in Lake Oswego, Oregon.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq*.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over Home because Home maintains its principal place of business within Oregon at Lake Oswego, Oregon.

5.      Home has done business in this district, and has committed acts of patent infringement in this district.  Home continues to commit these acts of infringement, entitling Savannah to relief.  Therefore, venue is proper in this federal district pursuant to 28 U.S.C. §§1391(b)-(c) and 1400(b).

## PATENTS-IN-SUIT

6.      On October 29, 2013, the USTTO duly and legally issued this United States Patent No. 8,567,688 ("the '688 Patent") entitled Moisture Reduction and Mold and Moisture Damage Preventative System and Method in Construction patent attached as Exhibit A.  Savannah holds all rights, title, and interest in and to the '688 Patent.

7.      On December 15, 2015, the USPTO duly and legally issued United States Patent No. 9,213,023 ("the '023 Patent"), entitled "Building Moisture Content Certification System and

Page 2 -    COMPLAINT FOR PATENT INFRINGEMENT

Method," attached as Exhibit B.  Savannah holds all rights, title, and interest in and to the '023 Patent.

8.      On March 19, 2019, the USPTO duly and legally issued United States Patent No. 10,234,200 ("the '200 Patent"), entitled "Moisture Reduction and Mold and Moisture Damage Prevention System and Method in Construction", attached as Exhibit C.  Savannah holds all rights, title, and interest in and to the '200 Patent.

9.      The '688 Patent, '023 Patent and the '200 Patent shall collectively be called "the Patents-In-Suit."

## FACTUAL ALLEGATIONS

10.      The Patents-in-Suit generally cover methods and processes for addressing the issue of moisture content in a structure.  They describe, *inter alia¸* improved methods, systems and processes for reducing the moisture content of wood framing during construction and certifying that the moisture content is below the level specifically determined to be problematic before construction is completed.

11.      Home makes, uses, sells, and offers for sale in the United States services that employ the patented technology ("Accused Home Services.")

12.      Home has committed and continues to commit acts of infringement under 35 U.S.C. § 271 by making, using, offering for sale and/or selling the Accused Home Services.

13.      On information and belief, Home was aware of the Patents-In-Suit prior to the filing of this Complaint, in view of a prior similar lawsuit in the District of Oregon.

14.      Despite this knowledge of Savannah's patent rights, Home, on information and belief, has continued to commit acts of infringement.

## COUNT I:  INFRINGEMENT OF U.S. PATENT NO. 8,567,688

15.     Savannah incorporates by reference the preceding paragraphs set forth above.

16.     As described above, Home has infringed and continues to infringe the '688 Patent.

17.     The Accused Home Services meet one or more claims of the '688 Patent.

18.     Home makes, uses, offers to sell, and/or sells the Accused Home Services within the United States without authority from Savannah.

19.     Home certifies a moisture content level in the wood framing of new construction.

20.     Home measures, with a moisture meter, moisture content at a plurality of interior locations within a building.

21.     Home compares the measured moisture content with a threshold moisture content level.

22.     Home dries, with at least one drying device, a space of the building in order to reduce the moisture content at the plurality of interior locations, wherein at least one drying device is located within the building while drying the space.

23.     Home measures, with the moisture meter, moisture content at one or more of the plurality of interior locations to confirm that the moisture content is below the threshold moisture content level.

24.     Home has infringed directly and continues to infringe directly the '688 Patent. Upon information and belief, Home had actual notice of the '688 Patent and of its infringement.

25.     In addition to its direct infringement, Home has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of the method and system claims of the '688 Patent in the State of Oregon, in this judicial district, and elsewhere within the United States by, among other things, making, using, licensing, selling, offering for

sale, the Accused Home Services, covered by one or more process claims of the '688 Patent, all to the injury of Savannah. Home's acts of infringement have been willful, deliberate, and in reckless disregard of Savannah's patent rights.

26.     The acts of infringement by Home have caused damage to Savannah, and Savannah is entitled to recover from Home the damages sustained by Savannah as a result of Home's wrongful acts in an amount subject to proof at trial. The infringement of Savannah's exclusive rights under the '688 Patent by Home has damaged and will continue to damage Savannah.

27.     Upon information and belief, Home knew of, or was willfully blind to, the existence of the '688 Patent, yet Home continues to infringe said patent. For that reason and the reasons described above, the infringement of the '688 Patent by Home is willful and deliberate, and with full knowledge of the patent, entitling Savannah to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. §285.

## COUNT II:  INFRINGEMENT OF U.S. PATENT NO. 9,213,023

28.     Savannah incorporates by reference the preceding paragraphs set forth above.

29.     As described above, Home has infringed and continues to infringe the '023 Patent.

30.     The Accused Home Services meet one or more claims of the '023 Patent.

31.     Home makes, uses, offers to sell, and/or sells the Accused Home Services within the United States without authority from Savannah.

32.     Home certifies a moisture content level in the wood framing of new construction.

33.     Home measures, with a moisture meter, moisture content at a plurality of interior locations within a building.

34.     Home compares the measured moisture content with a threshold moisture content level.

35.    Home dries, with at least one drying device, a space of the building in order to reduce the moisture content at the plurality of interior locations, wherein at least one drying device is located within the building while drying the space.

36.    Home measures, with the moisture meter, moisture content at one or more of the plurality of interior locations to confirm that the moisture content is below the threshold moisture content level.

37.    Home has infringed directly and continues to infringe directly the '023 Patent.  As alleged above, upon information and belief, Home had actual notice of the '023 Patent and of its infringement.

38.    In addition to its direct infringement, Home has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of the method and system claims of the '023 Patent in the State of Oregon, in this judicial district, and elsewhere within the United States by, among other things, making, using, licensing, selling, offering for sale, the Accused Home Services, covered by one or more process claims of the '023 Patent, all to the injury of Savannah.  Home's acts of infringement have been willful, deliberate, and in reckless disregard of Savannah's patent rights.

39.    The acts of infringement by Home have caused damage to Savannah, and Savannah is entitled to recover from Home the damages sustained by Savannah as a result of Home's wrongful acts in an amount subject to proof at trial.  The infringement of Savannah's exclusive rights under the '023 Patent by Home has damaged and will continue to damage Savannah.

40.    Upon information and belief, Home knew of, or was willfully blind to, the existence of the '023 Patent, yet Home continues to infringe said patent.  For that reason and the reasons described above, the infringement of the '023 Patent by Home is willful and deliberate, and with

full knowledge of the patent, entitling Savannah to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. §285.

## COUNT III: INFRINGEMENT OF US PATENT NO. 10,234,200

41.     Savannah incorporates by reference the preceding paragraphs set forth above.

42.     As described above, Home has infringed and continues to infringe the '200 Patent.

43.     The Accused Home Services meet one or more claims of the '200 Patent.

44.     Home makes, uses, offers to sell, and/or sells the Accused Home Services within the United States without authority from Savannah.

45.     Home sells and offers for sale a process for treating a wood frame within a space located in new construction before wall board is applied to said frame in order to prevent structural damage and/or the growth of mold or mildew.

46.     Home measures the moisture content of the wood frame using a moisture meter within a plurality of locations within the space.

47.     Home determines whether the measured moisture content meets a threshold indication recommending that drying be performed.

48.     Home places at least one drying device on communication with the space and operates it for the purpose of reducing the moisture in the frame, wherein the at least one drying device is a dehumidifier, a space heater, or an air moving device.

49.     Home further places a vapor barrier between the space and other spaces located within the new construction.

50.     Upon information and belief, Home has infringed directly and continues to infringe directly the '200 Patent.  As alleged above, Home had actual notice of the '200 Patent and of its infringement.

51.     In addition to its direct infringement, Home has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of the method and system claims of the '200 Patent in the State of Oregon, in this judicial district, and elsewhere within the United States by, among other things, making, using, licensing, selling, offering for sale, the Accused Home Services, covered by one or more process claims of the '200 Patent, all to the injury of Savannah.  Home's acts of infringement have been willful, deliberate, and in reckless disregard of Savannah's patent rights.

52.     The acts of infringement by Home have caused damage to Savannah, and Savannah is entitled to recover from Home the damages sustained by Savannah as a result of Home's wrongful acts in an amount subject to proof at trial. The infringement of Savannah's exclusive rights under the '200 Patent by Home has damaged and will continue to damage Savannah.

53.     Upon information and belief, Home knew of, or was willfully blind to, the existence of the '200 Patent, yet Home continues to infringe said patent.  For that reason and the reasons described above, the infringement of the '200 Patent by Home is willful and deliberate, and with full knowledge of the patent, entitling Savannah to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.


## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Savannah hereby demands a trial by jury of all issues so triable that are raised herein or which hereinafter may be raised in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Savannah requests entry of judgment in its favor and against Home as follows:

a       A declaration that Defendant has infringed and are infringing the '688, '023, and '200 Patents;

b       An award of damages to Savannah arising out of Defendant's infringement of the '688, '023, and '200 Patents, including enhanced damages pursuant to 35 U.S.C. § 284, together with prejudgment and post-judgment interest, in an amount according to proof;

c       An award of attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

d       An award to Savannah of its costs; and

e       Such other and further relief, whether legal, equitable, or otherwise, to which Savannah may be entitled or which this Court may order.

Dated this 20th day of February, 2024.

HITT HILLER MONFILS WILLIAMS LLP

By: _s/ James L. Hiller_
James L. Hiller, OSB # 772220
*Of Attorneys for Plaintiff*



US008567688B2

(12) **United States Patent**
Weisenberger et al.

(10) Patent No.: **US 8,567,688 B2**
(45) Date of Patent: **Oct. 29, 2013**

(54) **MOISTURE REDUCTION AND MOLD AND MOISTURE DAMAGE PREVENTATIVE SYSTEM AND METHOD IN CONSTRUCTION**

(76) Inventors: **Andrew R. Weisenberger**, Milwaukie, OR (US); **Robert A. Weisenberger**, West Linn, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 304 days.

(21) Appl. No.: **10/621,859**

(22) Filed: **Jul. 16, 2003**

(65) **Prior Publication Data**

US 2005/0011962 A1     Jan. 20, 2005

(51) **Int. Cl.**
| | | |
|---|---|---|
| *F24F 3/14* | (2006.01) | |
| *G01F 3/02* | (2006.01) | |
| *F25B 49/00* | (2006.01) | |

(52) **U.S. Cl.**
USPC ...................... **236/44 A**; 236/44 R; 62/176.1

(58) **Field of Classification Search**
USPC ........... 236/44 A, 44 R; 62/176.1, 176.5, 150
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,775,944 | A | | 10/1988 | Nakamura | |
| 5,004,483 | A | * | 4/1991 | Eller et al. | 95/10 |
| 5,212,958 | A | * | 5/1993 | Anderson | 62/150 |
| 5,259,553 | A | | 11/1993 | Shyu | |
| 5,992,161 | A | * | 11/1999 | O'Halloran et al. | 62/90 |
| 6,340,892 | B1 | | 1/2002 | Rynhart et al. | |
| 6,402,613 | B1 | * | 6/2002 | Teagle | 454/195 |
| 6,705,939 | B2 | | 3/2004 | Roff | |
| 2003/0040934 | A1 | | 2/2003 | Skidmore et al. | |
| 2004/0190586 | A1 | | 9/2004 | Lee et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2002317560 A | 10/2002 |

OTHER PUBLICATIONS

Solutions—Munters Keeps Construction Projects on Schedule! Munters 2000/2001.*
Preventing Mold by Keeping New Construction Dry. Harriman, Schnell & Fowler, p. 28-34, ASHRAE Journal, Sep. 2002.*
Preventing Mold by Keeping New Construction Dry. Harriman, Schnell S Fowler, presented at the 2001 ASHRAE IAQ seminar, 2001.*
Construction Drying, Munters Oct. 2000.*
Using Desiccant Technology to End Moisture Nightmare on Construction Projects, Munters, Feb. 21, 2002.*
Willis, "Creating a Little Desert Indoors—Dehumidifiers speed up finish work inside NW buildings", Jun. 1, 2000, Daily Journal of Commerce.*
Munters, "Case Study—Construction Drying: Mold and Mildew Protection Project Yields Multiple Benefits Round Rock, Texas", Mar. 2002.*
Harriman et al., "Preventing Mold by Keeping New Construction Dry", ASHRAE Meeting, Jan. 2003, Chicago, IL.*
Archive Press Release, "Munters New HCU Product Allows Dehumidity Control Independently of Temperature Control", http:// News.thomasnet.com/fullstory/7783, Mar. 8, 2002.*

*Primary Examiner* — Chen Wen Jiang
(74) *Attorney, Agent, or Firm* — Stolowitz Ford Cowger LLP

(57) **ABSTRACT**

A moisture removal system and method employing air movers, dehumidifiers, heaters and attendant methods for reducing moisture in a construction project. The method and system include operating moisture removal equipment and testing moisture content levels sufficient to reduce the moisture content levels to a desired threshold to reduce the likelihood of mold growing or moisture damage in the construction after it is completed.

**2 Claims, 1 Drawing Sheet**



**EXHIBIT A**
**Page 1 of 6**

# US 8,567,688 B2

Page 2

(56)        **References Cited**

OTHER PUBLICATIONS

Moisture Intrusion and Inspection, 2 pages, from www.
residentialinspections.com, copyright 2001, Residential Inspections
LLC. Publication date unknown.
Mold in Your Home, 6 pages, from www.residentialinspections.com,
copyright 2001, Residential Inspections LLC. Publication date
unknown.
"Wood Moisture Content", from Clemson Extension Residential
Housing, HL 255, Rev. Apr. 1997.
Moisture Testing Guide for Wood Frame Construction Clad With
Exterior Insulation and Finish Systems (EIFS):, 31 pages, from www.
toolbase.org/Docs/MainNav/MoistureandLeaks/876__protocol5A.
pdf?TrackID=&CategoryID=1013&DocumentID=876,    Aug.    4,
1998.

"Testing Housing Materials for Moisture", 2 pages, from www.ex-
tension.umn.edu/info-u/household/BK270.html, Copyright 1998.
Data and brochure sheets for the Quest Technologies Indoor Air
Quality Monitors models aq-5000 and aq-5001. A brief summary of
the devices can be found at the following web site addresses: http://
www.quest-technologies.com/AQ/aq5000.htm    and    http://www.
quest-technologies.com/IAQ/aq5001.htm.
ASTM, (1998), D4444-92e1 standard test methods for use and cali-
bration of hand-held moisture meters, American society for Testing
and Materials; abstract obtained from http://alcor.concordia.ca/~
raojw/crd/reference/reference000784.html.
"Indoor Air Quality Monitors", Quest Technologies PDF Brochure
for Model AQ 5000 Hand Held IAQ Monitor and Model AQ 5001
Portable IAQ Monitor, Rev. A Apr. 2000.
Decision on Appeal mailed Apr. 25, 2012 in related U.S. Appl. No.
10/621,860, filed Apr. 25, 2012.

* cited by examiner



**1**

## MOISTURE REDUCTION AND MOLD AND MOISTURE DAMAGE PREVENTATIVE SYSTEM AND METHOD IN CONSTRUCTION

### BACKGROUND OF THE INVENTION

This invention relates to buildings and construction, and more particularly to controlling moisture to reduce the likelihood of mold growth and moisture damage.

Mold and mildew problems in buildings are becoming more common, and can lead to substantial remediation efforts, with associated costs or litigation.

In building construction, whether commercial or single or multiple family residential, problems can arise if a particular level of moisture remains in walls at the time the walls are sealed. During construction, these buildings are typically wet, either from rain/snow or from wet construction materials being used, for example, wet wood, or materials that are applied in a wet state and then need to dry. Mold will typically grow in wood or other construction material when there is sufficient moisture present, for example, above 20% moisture in Douglas fir.

Mold spores can grow if sufficient moisture is sealed into construction material and there is an available food source. Should mold develop, it is often detected immediately, or sometimes such detection is delayed. In some cases, it is never detected.

Mold remediation, such as removal and prevention of future growth, is costly and time consuming. The existence of mold in a construction project can cause public relations issues, wherein the builder or project developer can be equated with the bad publicity related to the mold issues. Still further, legal issues can arise, related to the costs and delay of remediation, alleged health issues from occupants of the affected buildings, and contractual disputes arising over purchase or lease of the affected property, as a purchaser might wish to cancel a property transaction based on the mold issues.

Apart from mold issues, the presence of moisture alone can also lead to damage to structures and materials, resulting in costly remediation with corresponding issues to those noted hereinabove with respect to mold.

Financing and monetary requirements demand that structures be built as quickly as possible, to minimize the duration of construction financing, for example, and to increase construction-related revenue. Such time constraints result in framing being covered up as quickly as possible. These time constraints do not allow a builder to have a partially completed structure sit for weeks to allow any moisture in the construction materials to naturally reach equilibrium with its environment, and this increases the likelihood that wet materials may be sealed up, leading to a higher likelihood of mold growth or moisture damage occurring. Depending on climate factors, the business cycle of construction may not allow sufficient time for waiting for the natural drying process.

In particular in new construction, building practices resulting in an energy efficient structure may severely restrict airflow between the interior and exterior of a structure, resulting in trapping of moisture inside the structure. This can increase the likelihood of mold or moisture problems in structures today.

Heretofore, the issue of mold has been addressed as an afterthought in reactive fashion, only being tackled when mold appears, advising cleaning up mold quickly when it appears, for example.

### SUMMARY OF THE INVENTION

In accordance with the invention, a system and method is provided for removing moisture from a construction project,

**2**

to ensure sufficiently low moisture content is present in the construction before it is sealed.

Accordingly, it is an object of the present invention to provide an improved method for reducing moisture in construction projects below a desired level.

It is a further object of the present invention to provide an improved system for removing moisture from construction projects.

The subject matter of the present invention is particularly pointed out and distinctly claimed in the concluding portion of this specification. However, both the organization and method of operation, together with further advantages and objects thereof, may best be understood by reference to the following description taken in connection with accompanying drawings wherein like reference characters refer to like elements.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of the process according to the present invention.

### DETAILED DESCRIPTION

The system according to a preferred embodiment of the present invention comprises a system and method for reducing moisture content in a building or portion of a building under construction, wherein said reduction is made as a curative and preventative measure that takes place at a specific phase in the construction process.

Referring now to FIG. **1**, which is a block diagram of the moisture reduction process according to the present invention, the system and method are typically employed, in the case of construction, after the roof, windows and doors are installed and before the so called finish trades (wall board, insulation, cabinetry, etc.) are done. When a decision to take the preventative measure has been made, initial readings of moisture content of construction materials, relative humidity and temperature are taken in the building under test (step **12**). These measurements are made to determine how to effect moisture removal in the building and may be made, for example, with a GE Protimeter MMS Plus model by GE Protimeter, 500 Research Drive, Wilmington, Mass., US, or the Tramex Moisture Meter, from Tramex Ltd. of Dublin, Ireland moisture meter in particular embodiments.

Next, in step **16**, a determination is made based on the results of the readings, whether preventative moisture removal is warranted. For example, if moisture content of Douglas fir is below 20% moisture content, moisture removal treatment may not be needed. If further treatment is not needed, then the process is complete at block **18**. However, if further treatment is deemed advisable, then the process continues to block **20**, wherein moisture reduction equipment is placed within the space that is to be treated. The specific moisture reduction equipment employed can vary based on the moisture removal needs of the structure, but typically will include air moving equipment, such as blowers, for circulating the air within the space, dehumidifiers to extract the moisture from the air and either contain it within the dehumidifier or dispose of it external to the space (by a drain tube, for example). Additionally, heating equipment may be employed, to raise the temperature within the space to increase the speed of moisture removal.

Examples of typical equipment that may be employed in the system and performing the method is as follows:

Blower: An electric portable blower that provides a continuous, high velocity airflow, such as model #797 Ace Tur-

**EXHIBIT A**

**Page 4 of 6**

US 8,567,688 B2

**3**

boDryer, from Dri-Eaz of Burlington, Wash., US, or the Dri-Eaz Santana SX model turbodryer, or the Gale Force air mover by Dry Air Technology of Burlington, Wash.

Dehumidifier: #721 DrizAir 1200, by Dri-Eaz of Burlington, Wash., US. This is a refrigerant dehumidifier which provides a 15 gallon per day maximum moisture removal output level, while drawing 6.4 amps current at 120V. Also, the DrizAir 2000, a 25 gallon per day model can be employed. Alternatively, a DriTec desiccant dehumidifier may be employed, which uses silica gel to adsorb moisture from the air, manufactured by Dri-Eaz of Burlington, Wash.

Heater: portable heaters, such as propane/natural gas powered heaters, such as the Dri-Eaz K85 mobile furnace, by Dri-Eaz of Burlington, Wash., US.

In a typical installation, four or five blowers or fans will be grouped together with one dehumidifier and heater in a given space.

Depending on the particular characteristics of the space being treated, openings into other rooms or other parts of a building are sealed off with some sort of vapor barrier (for example, plastic sheeting in roll form and duct tape to seal the sheeting to close off the opening). Also, window or door openings that do not yet have the windows or doors installed may be sealed in corresponding fashion.

Once the equipment is in place, the blowers and dehumidifier are activated (and heaters, if present) and they are allowed to run for a period of time (block **22**), typically a 24 hour period, whereupon further moisture readings are taken (block **24**) to track the progress of moisture removal. At decision block **26**, a determination is made whether sufficient moisture has been removed from the space. If not, then the equipment is allowed to continue to operate. Optionally, the equipment may be moved around to different locations within the space being treated (block **28**). The process loops back to allow the passage of time at block **22**, and the time/readings/determine whether acceptable moisture content reduction has occurred cycle continues until the result of the decision block **26** is that yes, the moisture content has been reduced to an acceptable level (for example, 20% or lower moisture content). Then the moisture removal process is completed and the equipment is removed (block **30**).

A typical time between the initial placement of the equipment and determination that the space has a sufficiently low moisture content level is 4 to 7 days. Of course this depends on a number of factors, including the initial moisture content of the space, the capacity of the moisture control equipment that is installed, and relative humidity and temperature, for example.

Some other possible variations in the process can occur. For example, if at block **24**, when further readings are taken after the passage of time, it is determined that the moisture level is not being reduced (or is not being reduced at a sufficient rate), then additional blower/dehumidifier/heating equipment may be added. Further, if after a passage of time, the moisture levels are not reducing in a desired fashion, this typically indicates that moisture is leaking into the space from an outside source (for example an improperly installed roof is leaking) and investigation of the source of the moisture should be made.

Examples of application of the system and method are given below. The measurement goal for all tests in these particular examples is 18% moisture content:

**4**

EXAMPLE 1

New construction, 1500 square feet.

Day 1, temperature 71.5° F., 36.7% relative humidity. 2 measurements were taken low along wall studs, giving 16 and 18% moisture content. 4 measurements were taken high along wall studs, giving 16, 24, 21 and 21%.

Moisture removal equipment was installed and allowed to run for the rest of day 1. On day 2, temperature was 64.7° F., 46.9% relative humidity. 2 measurements were taken low along wall studs, giving 16 and 18% moisture content. 4 measurements were taken high along wall studs, giving 16, 18, 18 and 18% moisture content. The moisture removal operation was judged completed.

EXAMPLE 2

New construction, 2200 square feet.

Day 1, temperature 69.4° F., 49.1% relative humidity. 7 measurements were taken low along wall studs, giving 25, 20, 25, 25, 15, 25 and 22% moisture content. 7 measurements were taken high along wall studs, giving 21, 19, 25, 25, 25, 25 and 25%.

Moisture removal equipment was installed and allowed to run. On day 2, temperature was 65.1° F., 55.3% relative humidity. 7 measurements were taken low along wall studs, giving 20, 17, 25, 25, 20, 21 and 20% moisture content. 7 measurements were taken high along wall studs, giving 22, 18, 23, 23, 15, 21 and 20% moisture content. The moisture removal operation was continued, and then further measurements were taken on day 3. 6 lower level measurements of 20, 18, 18, 18, 15 and 21% moisture content were taken, and 7 upper level measurements of 18, 17, 20, 23, 18, 18 and 20% were recorded. Moisture removal was continued and on day 4, 7 measurements were taken at both lower and upper levels, resulting in: lower 18, 18, 18, 18, 15, 18, 17; and upper 16, 16, 17, 16, 18, 16, 15. The moisture removal operation was judged completed at this state.

EXAMPLE 3

New construction, 2300 square feet.

Day 1, temperature 63.2° F., 38.0% relative humidity. 7 measurements were taken low along wall studs, giving 15, 20, 15, 15, 30, 30, and 16% moisture content. 7 measurements were taken high along wall studs, giving 30, 30, 30, 18, 25, 24 and 20%.

Moisture removal equipment was installed and allowed to run until day 2, when further measurements are made, temperature was 80.2° F., 29.5% relative humidity. Measurements low along wall studs were 15, 15, 15, 15, 20, 15 and 16% moisture content. High location measurements were 25, 20, 25, 18, 23, 20 and 20% moisture content. The moisture removal operation was continued until day 3, when measurements as follows were judged to have sufficiently accomplished the desired moisture removal: low, 15, 15, 15, 15, 18, 15, 16%; and high 18, 17, 18, 18, 16, 15, 18%.

EXAMPLE 4

New construction, 1500 square feet.

Day 1, temperature 68.8° F., 43.0% relative humidity. 4 measurements were taken low along wall studs, giving 21, 18, 15 and 17% moisture content. 7 measurements were taken high along wall studs, giving 15, 25, 25, 21, 16, 15 and 18%.

Moisture removal equipment was installed and allowed to run. On day 2, when further measurements are made, tem-

**EXHIBIT A**
**Page 5 of 6**

US 8,567,688 B2

**5**

perature was 58.4° F., 59.4% relative humidity. Measurements low along wall studs were 18, 18, 15 and 17% moisture content. High location measurements were 15, 18, 18, 17, 16, 15 and 18% moisture content. This was sufficient moisture removal to complete the operation.

### EXAMPLE 5

New construction, 2150 square feet.

Day 1, temperature 57.4° F., 97.4% relative humidity. 7 measurements were taken low along wall studs, giving 20, 15, 20, 21, 40, 18 and 16% moisture content. Measurements taken high along wall studs were 20, 20, 23, 40, 22, 17 and 30%.

Moisture removal equipment was installed and allowed to run until day 2, when further measurements are made, temperature was 67.0° F., 47.9% relative humidity. Measurements low along wall studs were 15, 15, 15, 15, 18, 18 and 16% moisture content. High location measurements were 15, 15, 18, 16, 15, 17 and 17% moisture content. This was a sufficient moisture level to complete the operation.

### EXAMPLE 6

New construction, 2500 square feet.

Day 1, temperature 68.0° F., 36.6% relative humidity. 7 measurements were taken low along wall studs, giving 13, 11, 12, 11, 11, 13 and 10% moisture content. Measurements taken high along wall studs were 12, 11, 13, 10, 12, 13 and 11%.

Since all measurements were below the target level, no moisture removal was performed as the area was already at a sufficiently low moisture content.

In making measurements, any wood surfaces are measured, but typically moisture content measurements are made at base plates, studs and floors. It is not necessary to measure every stud in the structure, because if a stud with moisture content above the moisture threshold is detected in an area, then moisture removal will be performed in the area, so it isn't required to keep measuring at that point. Thus, for example, if the first set of measurements taken is beyond the acceptable moisture threshold, taking additional measurements is not necessary, but can be completed if desired, to provide historical data for comparison when the moisture removal is completed, and more measurements might be taken to further show overall moisture levels. Thus, in performing the process, typically moisture content tests are made throughout the structure, but moisture removal is only needed to be done in those areas where the moisture content level is too high.

Thus, in accordance with the system and method, a preventative moisture removal is accomplished to bring the moisture content level within a space to a desired level below that which would support mold growth, to reduce the likelihood that mold or moisture damage problems will arise in the finished construction. Should mold or moisture damage prob-

**6**

lems arise later, however, the builder has useful information to help locate the cause of the mold growth or moisture damage, as it is known from the use of the system and method that at a crucial point in the construction process, the moisture content level had been reduced sufficiently to prevent such growth or water damage. This information can help in determining what party might bear the responsibility for costs involved in mold or moisture damage remediation procedures. It can also assist in determining the construction stage at which a mold infestation or moisture entry took place.

While in the preferred embodiment, the moisture content level of 20% is a desired threshold, applied to Douglas fir wood, for example, below which the moisture content is desirably reduced, and while 18% was given as the threshold level in the illustrative examples herein, different levels may be appropriate in other types of wood and in other materials such as engineered woods (oriented strand board, plywood, fiberboard, etc.), wallboard or other materials.

While a preferred embodiment of the present invention has been shown and described, it will be apparent to those skilled in the art that many changes and modifications may be made without departing from the invention in its broader aspects. The appended claims are therefore intended to cover all such changes and modifications as fall within the true spirit and scope of the invention.

What is claimed is:

**1**. A process for treating a space within a construction of a new home to prevent structural damage and/or the growth of mold or mildew, comprising the steps of:

 measuring moisture content using a moisture meter at a plurality of locations within the space, wherein said plurality of locations include low and high locations of a plurality of exposed wall studs;

 determining whether the measured moisture content meets a threshold indication recommending that drying be performed;

 positioning and operating only within the space at least one drying device for the purpose of reducing the moisture level within the space and thereby reducing the moisture level in structural components of the space, wherein the at least one drying device is selected from the group consisting of a dehumidifier, a space heater, and an air moving device; and

 further comprising the step of substantially sealing off the space being treated with a vapor barrier relative to other space within said new home.

**2**. The process according to claim **1**, wherein said at least one drying device is a dehumidifier and is operated for a period of time, whereupon one or more further moisture content readings are taken, and a decision is made whether to continue operating said dehumidifier based on whether said one or more further moisture content readings meet the threshold indication.

\*    \*    \*    \*    \*

US009213023B2

(12) **United States Patent**  (10) **Patent No.:    US 9,213,023 B2**
Weisenberger et al.  (45) **Date of Patent:    \*Dec. 15, 2015**

(54) **BUILDING MOISTURE CONTENT CERTIFICATION SYSTEM AND METHOD**

(75) Inventors: **Andrew R. Weisenberger**, New York, NY (US); **Robert A. Weisenberger**, New York, NY (US)

(73) Assignee: **SAVANNAH IP. INC.**, Milwaukie, OR (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/621,860**

(22) Filed: **Jul. 16, 2003**

(65) **Prior Publication Data**

US 2005/0011255 A1    Jan. 20, 2005

(51) **Int. Cl.**
| *G01N 5/02* | (2006.01) |
| *G01N 33/46* | (2006.01) |
| *G01N 33/38* | (2006.01) |
| *G06Q 30/00* | (2012.01) |

(52) **U.S. Cl.**
CPC ................ *G01N 33/46* (2013.01); *G01N 33/38* (2013.01); *G06Q 30/018* (2013.01)

(58) **Field of Classification Search**
CPC ........ G01N 5/02; G01N 5/025; G01N 27/048
USPC .............................................. 73/73; 324/640
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,775,944 A | \* | 10/1988 | Nakamura | .................... 700/277 |
| 5,004,483 A | | 4/1991 | Eller et al. | |
| 5,212,958 A | | 5/1993 | Anderson | ....................... 62/150 |
| 5,259,553 A | \* | 11/1993 | Shyu | ............................ 236/49.3 |
| 5,992,161 A | | 11/1999 | O'Halloran et al. | ............... 62/90 |
| 6,340,892 B1 | \* | 1/2002 | Rynhart et al. | ................ 324/640 |
| 6,402,613 B1 | | 6/2002 | Teagle | |
| 6,705,939 B2 | \* | 3/2004 | Roff | ............................... 454/185 |
| 8,567,688 B2 | | 10/2013 | Weisenberger et al. | |
| 2003/0040934 A1 | \* | 2/2003 | Skidmore et al. | .................. 705/1 |
| 2004/0190586 A1 | \* | 9/2004 | Lee et al. | ........................... 374/5 |
| 2014/0020261 A1 | | 1/2014 | Weisenberger et al. | |

FOREIGN PATENT DOCUMENTS

| CA | 2447389 A1 | 1/2005 |
| JP | 2002317560 A | \* 10/2002 |

OTHER PUBLICATIONS

"Moisture Testing Guide for Wood Frame Construction Clad With Exterior Insulation and Finish Systems (EIFS)", 31 pages, from www.toolbase.org/Docs/MainNav/MoistureandLeaks/876_protocol5A.pdf?TrackID=&CategoryID=1013&DocumentID=876, Aug. 4, 1998.\*

"Testing Housing Materials for Moisture", 2 pages, from www.extension.umn.edu/info-u/household/BK270.html, Copyright 1998.\*

(Continued)

*Primary Examiner* — Hezron E Williams

*Assistant Examiner* — Rodney T Frank

(74) *Attorney, Agent, or Firm* — Schwabe Williamson & Wyatt

(57)    **ABSTRACT**

A moisture content level certification system and method involves taking moisture content measurements within a structure and issuing a certificate of moisture content level. Moisture content level pass/failure certifications may also be issued.

**20 Claims, 2 Drawing Sheets**



**EXHIBIT B**
**Page 1 of 8**

US 9,213,023 B2

Page 2

(56)            **References Cited**

OTHER PUBLICATIONS

"Indoor Air Quality Monitors", Quest Technologies PDF Brochure for Model AQ 5000 Hand Held IAQ Monitor and Model AQ 5001 Portable IAQ Monitor, Rev. A Apr. 2000.*

ASTM, (1998), D4444-92e1 standard test methods for use and calibration of hand-held moisture meters, American Society for Testing and Materials; abstract obtained from http://alcor.concordia.ca/~raojw/crd/reference/reference000784.html.*

Data and brochure sheets for the Quest Technologies Indoor Air Quality Monitors models aq-5000 and aq-5001. A brief summary of the devices can be found at the following web site addresses: http://www.quest-technologies.com/IAQ/aq5000.htm and http://www.quest-technologies.com/IAQ/aq5001.htm.*

U.S. Appl. No. 60/453,856 for establishement of priority over the present application.*

Harriman III et al. article, "Preventing Mold by Keeping New Construction Dry", ASHRAE Journal, Sep. 2002, obtained via http://www.floodrentals.com/images/Preventing_Mold_In_New_Construction.pdf.*

Mold in Your Home, 6 pages, from www.residentialinspections.com, copyright 2001, Residential Inspections LLC. Publication date unknown.

Solutions—Munters Keeps Construction Projects on Schedule! Munters 2000/2001.

Preventing Mold by Keeping New Construction Dry. Harriman, Schnell & Fowler, p. 28-34, ASHRAE Journal, Sep. 2002.

Preventing Mold by Keeping New Construction Dry. Harriman, Schnell & Fowler, presented at the 2001 ASHRAE IAQ seminar. 2001.

Construction Drying, Munters Oct. 2000.

Using Desiccant Technology to End Moisture Nightmare on Construction Projects, Munters, Feb. 21, 2002.

Moisture Intrusion and Inspection, 2 pages, from www.residentialinspections.com, copyright 2001, Residential Inspections LLC. Publication date unknown.

Mold in Your Home, 5 pages, from www.residentialinspections.com, copyright 2001, Residential Inspections LLC. Publication date unknown.

Wood Moisture Content, Clemson Extension Residential Housing, HL 255, Rev. p. 1-2, Rev. Apr. 1997.

Willis, "Creating a Little Desert Indoors—Dehumidifiers Speed Up Finish Work Inside NW Buildings", Jun. 1, 2000, Daily Journal of Commerce.

Munters, "Case Study—Construction Drying: Mold and Mildew Protection Project Yields Multiple Benefits Round Rock, Texas", Mar. 2002.

Harriman et al., "Preventing Mold by Keeping New Construction Dry", ASHRAE Meeting, Jan. 2003, Chicago, IL.

Archive Press Release, "Munters New HCU Product Allows Dehumidity Control Independently of Temperature Control", http://News.thomasnet.com/fullstory/7783, Mar. 8, 2002.

Stolowitz Ford Cowger LLP, "Listing of Related Cases", May 22, 2014, 1 page.

* cited by examiner



FIG. 1

**U.S. Patent**      Dec. 15, 2015      Sheet 2 of 2      US 9,213,023 B2



FIG. 2

US 9,213,023 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**BUILDING MOISTURE CONTENT
CERTIFICATION SYSTEM AND METHOD**

### BACKGROUND OF THE INVENTION

This invention relates to certification of buildings and construction, and more particularly to a system and method for certifying buildings to have an identified moisture content level to identify the probability of mold growth claims or moisture damage claims against a builder or owner.

Mold, mildew and water problems in buildings are becoming more common, and can lead to substantial remediation efforts, with associated costs or litigation.

In any structure problems can arise if a particular level of moisture content exists. Mold will typically grow in wood or other organic construction material above a certain moisture content. Thus, mold can grow in construction material if sufficient moisture is present in the structure components. Apart from mold, moisture damage to the structure or components thereof may result from moisture.

Should mold or other moisture related damage develop, it is often detected immediately, or sometimes such detection is delayed. In some cases, it is never detected.

Mold and moisture remediation and prevention of future growth, is costly and time consuming. The existence of mold and moisture damage in a structure can cause public relations issues, wherein the builder or owner can be equated with the bad publicity related to the mold and moisture damage issues. Still further, legal issues can arise, related to the costs and delay of remediation, alleged health issues from occupants of the affected buildings, and contractual disputes arising over purchase or lease of the affected property, as a purchaser might wish to cancel a property transaction based on the mold issues.

Financing and monetary requirements often demand that structures be built as quickly as possible, to minimize the duration of construction financing, for example, and to increase construction related revenue. Such time constraints result in framing being covered up as quickly as possible. These time constraints do not allow a builder to have a partially completed structure sit for days or weeks to allow any moisture in the construction materials to naturally reach equilibrium with the moisture in the environment, and this increases the likelihood that moisture may be sealed up, leading to a higher likelihood of mold growth occurring. Depending on climate factors, the business cycle of construction may not allow sufficient time for waiting for the natural drying process. Thus, the likelihood that a building may have excessive moisture content is increased. The presence of moisture and/or mold may also impact the ownership, use, financing, insurability, refinancing and sale of structures.

In sales of homes or structures, both sellers and purchasers may be unaware of moisture content within the structure.

Heretofore, the issue of moisture content in a building has been addressed as an afterthought in reactive fashion. There has been no organized manner or system to examine and consider the moisture content of a building and or to certify this moisture state.

### SUMMARY OF THE INVENTION

In accordance with the invention, a certification system and method is provided for addressing the issue of moisture content in a structure. In accordance with the system, a moisture content level determination is made and a certificate is issued to show moisture content.

Accordingly, it is an object of the present invention to provide an improved method for determining and certifying moisture content levels in construction projects.

It is a further object of the present invention to provide an improved system for determining and certifying of moisture content.

The subject matter of the present invention is particularly pointed out and distinctly claimed in the concluding portion of this specification. However, both the organization and method of operation, together with further advantages and objects thereof, may best be understood by reference to the following description taken in connection with accompanying drawings wherein like reference characters refer to like elements.

### BRIEF DESCRIPTION OF THE DRAWING

FIG. **1** is a block diagram of the process according to the present invention.

FIG. **2** is a block diagram of a process according to the present invention.

### DETAILED DESCRIPTION

The invention according to a preferred embodiment comprises a system and method for certifying a structure to have a moisture content. The certification may include certifying that moisture content levels have been measured, and may include a report of the measurement data that was actually recorded during the certification measurement phase.

Referring now to FIG. **1**, which is a block diagram of the moisture level certification process according to the present invention, initial readings of moisture content as well as the relative humidity and temperature are taken throughout the interior of the structure under test (step **12**). The relative humidity and temperature measurements are made to determine grains per pound. Moisture content readings may be made, for example, with a GE Protimeter MMS Plus model by GE Protimeter, 500 Research Drive, Wilmington, Mass., US, or the Tramex Moisture Meter, from Tramex Ltd. of Dublin, Ireland moisture meter in the preferred embodiment.

In making the measurements, test sites are selected to be places where moisture might typically exist throughout the structure, including but not limited to openings such as window frames, door frames, electrical outlets and the like. In buildings where a vapor barrier is present, any location where the vapor barrier might have been cut is measured. Further, measurements are taken along the floor, floor boards and baseboards, walls and ceiling. Typically a measurement every 1 to 2 feet would be sufficient.

After measurements have all been taken, typically in each room, for example, the measurement meter is connected to a computer and the data therein is uploaded to a database, for example, giving temperature, relative humidity, moisture content, grains per pound, etc., as well as the date and time of measurement. The computer may also include a printer or other I/O devices for printing or otherwise reporting data.

Next, in step **14**, a report is made of the results. In a particular embodiment, this report comprises details of a number of things, including:

Relative Humidity;
Temperature;
Grains Per Pound (specific humidity);
Moisture content measurements taken.

A decision may now be made at decision block **15**, whether interpretation of the moisture content measurements in the report is desired. If not, then the report certifies the measure-

US 9,213,023 B2

3

ments made and the process is then completed. The report certificate can advantageously include a print of the measurement data, showing all the measurement values, if desired.

If interpretation is desired, then next, in step **16**, a determination is made based on the results of the report, whether the moisture level within the portion of the structure being tested (testing may be done on subsets of an entire building) is within a desired level (for example, under 20% or under 18% in particular embodiments). If so, then a moisture content level pass certificate is issued (step **18**) which the building owner/builder/selling agent/buyer can then keep to establish the moisture content level. The process is then completed.

However, if at decision block **16**, moisture content was not within the desired level, a determination may be made at block **20** as to whether a moisture content level fail certificate is to be issued. If so, then a moisture content level failure certificate is issued (step **22**). In either case, the process is then completed.

Thus, in accordance with the system and method, a certificate is provided indicating that a structure has been tested as to its moisture content. Should moisture or mold problems arise later, however, the certificate holder has useful information to help locate the cause of the moisture or mold growth, or to identify lack of liability. It can also assist in determining the construction stage where the moisture damage or mold infestation was caused. Such certificate may be useful in obtaining more favorable insurance rates.

Additionally, the issuance of a failure certificate can be desirable and useful, when the certificate recipient is a party that is attempting to have moisture or mold remediation performed, or is attempting to prove the existence of the problem or to determine liability for remediation.

If a certificate is not issued, as a result of failing to pass, or if a failure certificate is issued, moisture removal may be performed as a remediation. Such moisture removal may be accomplished, as an example, in the manner described in co-pending U.S. patent application Ser. No. 10/621,859, filed concurrently herewith by the inventors of this present application, entitled MOISTURE REDUCTION AND MOLD AND MOISTURE DAMAGE PREVENTATIVE SYSTEM AND METHOD IN CONSTRUCTION, the disclosure of which is hereby incorporated by reference. Once such moisture removal is accomplished, the moisture content level certification process can be performed again, to then issue a certificate.

Further, a system according to a preferred embodiment of the present invention comprises a system and method for reducing moisture content in a building or portion of a building under construction, wherein said reduction is made as a curative and preventative measure that takes place at a specific phase in the construction process.

Referring now to FIG. **2**, which is a block diagram of the moisture reduction process according to the present invention, the system and method are typically employed, in the case of construction, after the roof, windows and doors are installed and before the so called finish trades (wall board, insulation, cabinetry, etc.) are done. When a decision to take the preventative measure has been made, initial readings of moisture content of construction materials, relative humidity and temperature are taken in the building under test (step **32**). These measurements are made to determine how to effect moisture removal in the building and may be made, for example, with a GE Protimeter MMS Plus model by GE Protimeter, 500 Research Drive, Wilmington, Mass., US, or the Tramex Moisture Meter, from Tramex Ltd. of Dublin, Ireland moisture meter in particular embodiments.

4

Next, in step **36**, a determination is made based on the results of the readings, whether preventative moisture removal is warranted. For example, if moisture content of Douglas fir is below 20% moisture content, moisture removal treatment may not be needed. If further treatment is not needed, then the process is complete at block **38**. However, if further treatment is deemed advisable, then the process continues to block **40**, wherein moisture reduction equipment is placed within the space that is to be treated. The specific moisture reduction equipment employed can vary based on the moisture removal needs of the structure, but typically will include air moving equipment, such as blowers, for circulating the air within the space, dehumidifiers to extract the moisture from the air and either contain it within the dehumidifier or dispose of it external to the space (by a drain tube, for example). Additionally, heating equipment may be employed, to raise the temperature within the space to increase the speed of moisture removal.

Examples of typical equipment that may be employed in the system and performing the method is as follows:

Blower: An electric portable blower that provides a continuous, high velocity airflow, such as model #797 Ace TurboDryer, from Dri-Eaz of Burlington, Wash., US, or the Dri-Eaz Santana SX model turbodryer, or the Gale Force air mover by Dry Air Technology of Burlington, Wash.

Dehumidifier: #721 DrizAir 1200, by Dri-Eaz of Burlington, Wash., US. This is a refrigerant dehumidifier which provides a 15 gallon per day maximum moisture removal output level, while drawing 6.4 amps current at 120V. Also, the DrizAir 2000, a 25 gallon per day model can be employed. Alternatively, a DriTec desiccant dehumidifier may be employed, which uses silica gel to absorb moisture from the air, manufactured by Dri-Eaz of Burlington, Wash.

Heater: portable heaters, such as propane/natural gas powered heaters, such as the Dri-Eaz K85 mobile furnace, by Dri-Eaz of Burlington, Wash., US.

In a typical installation, four or five blowers or fans will be grouped together with one dehumidifier and heater in a given space.

Depending on the particular characteristics of the space being treated, openings into other rooms or other parts of a building are sealed off with some sort of vapor barrier (for example, plastic sheeting in roll form and duct tape to seal the sheeting to close off the opening). Also, window or door openings that do not yet have the windows or doors installed may be sealed in corresponding fashion.

Once the equipment is in place, the blowers and dehumidifier are activated (and heaters, if present) and they are allowed to run for a period of time (block **42**), typically a 24 hour period, whereupon further moisture readings are taken (block **44**) to track the progress of moisture removal. At decision block **46**, a determination is made whether sufficient moisture has been removed from the space. If not, then the equipment is allowed to continue to operate. Optionally, the equipment may be moved around to different locations within the space being treated (block **48**). The process loops back to allow the passage of time at block **42**, and the time/readings/determine whether acceptable moisture content reduction has occurred cycle continues until the result of the decision block **46** is that yes, the moisture content has been reduced to an acceptable level (for example, 20% or lower moisture content). Then the moisture removal process is completed and the equipment is removed (block **50**).

A typical time between the initial placement of the equipment and determination that the space has a sufficiently low moisture content level is 4 to 7 days. Of course this depends on a number of factors, including the initial moisture content

US 9,213,023 B2

**5**

of the space, the capacity of the moisture control equipment that is installed, and relative humidity and temperature, for example.

Some other possible variations in the process can occur. For example, if at block **44**, when further readings are taken after the passage of time, it is determined that the moisture level is not being reduced (or is not being reduced at a sufficient rate), then additional blower/dehumidifier/heating equipment may be added. Further, if after a passage of time, the moisture levels are not reducing in a desired fashion, this typically indicates that moisture is leaking into the space from an outside source (for example an improperly installed roof is leaking) and investigation of the source of the moisture should be made.

Examples of application of the system and method are given below. The measurement goal for all tests in these particular examples is 18% moisture content:

**Example 1**

New construction, 1500 square feet.

Day 1, temperature 71.5° F., 36.7% relative humidity. 2 measurements were taken low along wall studs, giving 16 and 18% moisture content. 4 measurements were taken high along wall studs, giving 16, 24, 21 and 21%.

Moisture removal equipment was installed and allowed to run for the rest of day 1. On day 2, temperature was 64.7° F., 46.9% relative humidity. 2 measurements were taken low along wall studs, giving 16 and 18% moisture content. 4 measurements were taken high along wall studs, giving 16, 18, 18 and 18% moisture content. The moisture removal operation was judged completed.

**Example 2**

New construction, 2200 square feet.

Day 1, temperature 69.4° F., 49.1% relative humidity. 7 measurements were taken low along wall studs, giving 25, 20, 25, 25, 15, 25 and 22% moisture content. 7 measurements were taken high along wall studs, giving 21, 19, 25, 25, 25, 25 and 25%.

Moisture removal equipment was installed and allowed to run. On day 2, temperature was 65.1° F., 55.3% relative humidity. 7 measurements were taken low along wall studs, giving 20, 17, 25, 25, 20, 21 and 20% moisture content. 7 measurements were taken high along wall studs, giving 22, 18, 23, 23, 15, 21 and 20% moisture content. The moisture removal operation was continued, and then further measurements were taken on day 3. 6 lower level measurements of 20, 18, 18, 18, 15 and 21% moisture content were taken, and 7 upper level measurements of 18, 17, 20, 23, 18, 18 and 20% were recorded. Moisture removal was continued and on day 4, 7 measurements were taken at both lower and upper levels, resulting in: lower 18, 18, 18, 18, 15, 18, 17; and upper 16, 16, 17, 16, 18, 16, 15. The moisture removal operation was judged completed at this state.

**Example 3**

New construction, 2300 square feet.

Day 1, temperature 63.2° F., 38.0% relative humidity. 7 measurements were taken low along wall studs, giving 15, 20, 15, 15, 30, 30, and 16% moisture content. 7 measurements were taken high along wall studs, giving 30, 30, 30, 18, 25, 24 and 20%.

Moisture removal equipment was installed and allowed to run until day 2, when further measurements are made, tem-

**6**

perature was 80.2° F., 29.5% relative humidity. Measurements low along wall studs were 15, 15, 15, 15, 20, 15 and 16% moisture content. High location measurements were 25, 20, 25, 18, 23, 20 and 20% moisture content. The moisture removal operation was continued until day 3, when measurements as follows were judged to have sufficiently accomplished the desired moisture removal: low, 15, 15, 15, 15, 18, 15, 16%; and high 18, 17, 18, 18, 16, 15, 18%.

**Example 4**

New construction, 1500 square feet.

Day 1, temperature 68.8° F., 43.0% relative humidity. 4 measurements were taken low along wall studs, giving 21, 18, 15 and 17% moisture content. 7 measurements were taken high along wall studs, giving 15, 25, 25, 21, 16, 15 and 18%.

Moisture removal equipment was installed and allowed to run. On day 2, when further measurements are made, temperature was 58.4° F., 59.4% relative humidity. Measurements low along wall studs were 18, 18, 15 and 17% moisture content. High location measurements were 15, 18, 18, 17, 16, 15 and 18% moisture content. This was sufficient moisture removal to complete the operation.

**Example 5**

New construction, 2150 square feet.

Day 1, temperature 57.4° F., 97.4% relative humidity. 7 measurements were taken low along wall studs, giving 20, 15, 20, 21, 40, 18 and 16% moisture content. Measurements taken high along wall studs were 20, 20, 23, 40, 22, 17 and 30%.

Moisture removal equipment was installed and allowed to run until day 2, when further measurements are made, temperature was 67.0° F., 47.9% relative humidity. Measurements low along wall studs were 15, 15, 15, 15, 18, 18 and 16% moisture content. High location measurements were 15, 15, 18, 16, 15, 17 and 17% moisture content. This was a sufficient moisture level to complete the operation.

**Example 6**

New construction, 2500 square feet.

Day 1, temperature 68.0° F., 36.6% relative humidity. 7 measurements were taken low along wall studs, giving 13, 11, 12, 11, 11, 13 and 10% moisture content. Measurements taken high along wall studs were 12, 11, 13, 10, 12, 13 and 11%.

Since all measurements were below the target level, no moisture removal was performed as the area was already at a sufficiently low moisture content.

In making measurements, any wood surfaces are measured, but typically moisture content measurements are made at base plates, studs and floors. It is not necessary to measure every stud in the structure, because if a stud with moisture content above the moisture threshold is detected in an area, then moisture removal will be performed in the area, so it isn't required to keep measuring at that point. Thus, for example, if the first set of measurements taken is beyond the acceptable moisture threshold, taking additional measurements is not necessary, but can be completed if desired, to provide historical data for comparison when the moisture removal is completed, and more measurements might be taken to further show overall moisture levels. Thus, in performing the process, typically moisture content tests are made throughout the structure, but moisture removal is only needed to be done in those areas where the moisture content levels are high.

**EXHIBIT B**
**Page 7 of 8**

US 9,213,023 B2

7

8

Thus, in accordance with the system and method, a preventative moisture removal is accomplished to bring the moisture content level within a space to a desired level below that which would support mold growth, to reduce the likelihood that mold or moisture damage problems will arise in the finished construction. Should mold or moisture damage problems arise later, however, the builder has useful information to help locate the cause of the mold growth or moisture damage, as it is known from the use of the system and method that at a crucial point in the construction process, the moisture content level had been reduced sufficiently to prevent such growth or water damage. This information can help in determining what party might bear the responsibility for costs involved in mold or moisture damage remediation procedures. It can also assist in determining the construction stage at which a mold infestation or moisture entry took place.

While in the preferred embodiment, the moisture content level of 20% is a desired threshold, applied to Douglas fir wood, for example, below which the moisture content is desirably reduced, and while 18% was given as the threshold level in the illustrative examples herein, different levels may be appropriate in other types of wood and in other materials such as engineered woods (oriented strand board, plywood, fiberboard, etc.), wallboard or other materials.

While a preferred embodiment of the present invention has been shown and described, it will be apparent to those skilled in the art that many changes and modifications may be made without departing from the invention in its broader aspects. For example, while the preferred embodiments relate to desired moisture content levels being below a desired threshold, alternate embodiments include situations where the pass or failure of a moisture content analysis depends on the moisture content being above a desired threshold level or within a desired range. The appended claims are therefore intended to cover all such changes and modifications as fall within the true spirit and scope of the invention.

What is claimed is:

**1**. A method for certifying a moisture content level, comprising:

measuring, with a moisture meter, moisture content at a plurality of interior locations within a building;

comparing the measured moisture content with a threshold moisture content level;

drying, with at least one drying device, a space of the building in order to reduce the moisture content at the plurality of interior locations, wherein the at least one drying device is located within the building while drying the space; and

measuring, with the moisture meter, moisture content at one or more of the plurality of interior locations to confirm that the moisture content is below the threshold moisture content level.

**2**. The method of claim **1**, further comprising determining a construction stage where the moisture content was introduced to the plurality of interior locations, based at least in part on the measured moisture content.

**3**. The method of claim **1**, further comprising:

measuring a temperature at the plurality of interior locations;

measuring a relative humidity at the plurality of interior locations; and

determining grains per pound of moisture content at the plurality of interior locations based, at least in part, on the measured temperature and the measured relative humidity, wherein comparing the measured moisture content comprises comparing the grains per pound of moisture content with the threshold moisture content level.

**4**. The method of claim **1**, wherein the space of the building is surrounded by a vapor barrier prior to using the at least one drying device to remove the moisture content.

**5**. The method of claim **4**, wherein the at least one drying device is located within the vapor barrier while drying the space.

**6**. The method of claim **1**, wherein the plurality of interior locations comprise a window frame and a door frame.

**7**. The method of claim **1**, wherein the plurality of interior locations comprise at least one exposed wall stud.

**8**. The method of claim **7**, wherein the plurality of interior locations comprise both a high location of the at least one exposed wall stud and a low location of the at least one exposed wall stud.

**9**. The method of claim **8**, wherein the high location is near a ceiling or near a roof of the space.

**10**. The method of claim **8**, wherein the low location is near a floor of the space.

**11**. A system, comprising:

means for measuring moisture content at a plurality of interior locations within a building;

means for comparing the measured moisture content with a threshold moisture content level associated with a moisture content level certification; and

means for drying a space of the building in order to reduce the moisture content at the plurality of interior locations, wherein the means for drying is located within the building while the space is being dried, and wherein at least one of the plurality of interior locations is again measured for moisture content to confirm that the moisture content is below the threshold moisture content level.

**12**. The system of claim **11**, wherein the space comprises the building, and wherein the building is substantially sealed relative to outside of the building.

**13**. The system of claim **11**, wherein the space comprises one or more rooms of the building, and wherein the one or more rooms are substantially sealed relative to other rooms of the building.

**14**. The system of claim **11**, wherein the means for drying is entirely located within the space.

**15**. The system of claim **11**, wherein the means for drying comprises means for drying, prior to said measuring, the space of the building in a first drying operation, and wherein the moisture content is measured after the first drying operation is completed.

**16**. The system of claim **15**, wherein the means for comparing comprises means for determining whether a second drying operation is required in order to further reduce the moisture content.

**17**. The system of claim **11**, wherein the means for measuring comprises means for measuring the moisture content at multiple locations of at least one exposed wall stud in the space.

**18**. The system of claim **17**, wherein the multiple locations comprise both a high location of the at least one exposed wall stud and a low location of the at least one exposed wall stud.

**19**. The system of claim **18**, wherein the high location is near a ceiling or near a roof of the space.

**20**. The system of claim **18**, wherein the low location is near a floor of the space.

\* \* \* \* \*

US010234200B2

(12) **United States Patent**        (10) **Patent No.:**     **US 10,234,200 B2**
Weisenberger et al.                  (45) **Date of Patent:**      *Mar. 19, 2019

(54) **MOISTURE REDUCTION AND MOLD AND MOISTURE DAMAGE PREVENTATIVE SYSTEM AND METHOD IN CONSTRUCTION**

(71) Applicant: **SAVANNAH IP, INC.**, Milwaukie, OR (US)

(72) Inventors: **Andrew R. Weisenberger**, Milwaukie, OR (US); **Robert A. Weisenberger**, West Linn, OR (US)

(73) Assignee: **SAVANNAH IP, INC.**, Milwaukie, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 637 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/592,110**

(22) Filed: **Jan. 8, 2015**

(65) **Prior Publication Data**

US 2015/0121716 A1     May 7, 2015

**Related U.S. Application Data**

(60) Division of application No. 14/035,292, filed on Sep. 24, 2013, now abandoned, which is a continuation of
(Continued)

(51) **Int. Cl.**
*F26B 21/06*        (2006.01)
*F24F 3/14*         (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ................ *F26B 21/06* (2013.01); *F24F 3/14* (2013.01); *F26B 5/00* (2013.01); *E04B 1/70* (2013.01)

(58) **Field of Classification Search**
CPC .... F26B 21/06; F26B 5/00; F24F 3/14; E04B 1/70
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,775,944 A    10/1988   Nakamura
5,004,483 A     4/1991   Eller et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CA        2447389        1/2005
JP        H01298412 A  * 12/1989
(Continued)

OTHER PUBLICATIONS

Shiba, Method and Device for Controlling Humidity, Dec. 1, 1989, JPH01298412A, Whole Document.*
(Continued)

*Primary Examiner* — Larry Furdge
(74) *Attorney, Agent, or Firm* — Schwabe Williamson & Wyatt, PC

(57)        **ABSTRACT**

A moisture removal system and method employing air movers, dehumidifiers, heaters and attendant methods for reducing moisture in a construction project. The method and system include operating moisture removal equipment and testing moisture content levels sufficient to reduce the moisture content levels to a desired threshold to reduce the likelihood of mold growing or moisture damage in the construction after it is completed.

**9 Claims, 1 Drawing Sheet**



**EXHIBIT C**
**Page 1 of 7**

## US 10,234,200 B2

Page 2

### Related U.S. Application Data

application No. 10/621,859, filed on Jul. 16, 2003, now Pat. No. 8,567,688.

(51) **Int. Cl.**
**F26B 5/00**         (2006.01)
**E04B 1/70**         (2006.01)

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,212,958 A | | 5/1993 | Anderson |
| 5,259,553 A | | 11/1993 | Shyu |
| 5,992,161 A | | 11/1999 | O'Halloran et al. |
| 6,145,750 A | * | 11/2000 | Carpenter ........... F24F 11/0008 165/250 |
| 6,340,892 B1 | | 1/2002 | Rynhart et al. |
| 6,402,613 B1 | | 6/2002 | Teagle |
| 6,705,939 B2 | | 3/2004 | Roff |
| 8,567,688 B2 | | 10/2013 | Weisenberger et al. |
| 2002/0073628 A1 | * | 6/2002 | Dextras ................. E04B 1/7092 52/1 |
| 2003/0040934 A1 | | 2/2003 | Skidmore et al. |
| 2004/0190586 A1 | | 9/2004 | Lee et al. |
| 2005/0011255 A1 | | 1/2005 | Weisenberger et al. |
| 2005/0011962 A1 | | 1/2005 | Weisenberger et al. |
| 2014/0020261 A1 | | 1/2014 | Weisenberger et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | H07268976 A | * | 10/1995 |
| JP | 2002317560 | | 10/2002 |
| WO | WO2011136713 A1 | * | 11/2011 |

OTHER PUBLICATIONS

Ichikawa et al., Method for Improving House and Improved Housing Structure, Oct. 17, 1995,JPH07268976A, Whole Document.*
Pfister et al., System and Method for Ventilating a Defined Space, Nov. 3, 2011, WO2011136713A1, Whole Document.*
"Moisture Intrusion and Inspection", 2 pages, from www.residentialinspections.com, copyright 2001, Residential Inspections LLC, publication date unknown.

"Mold in Your Home", 6 pages, from www.residentialinspections.com, copyright 2001, Residential Inspections LLC, publication date unknown.
"Wood Moisture Content", from Clemson Extension Residential Housing, HL 255, Rev. Apr. 1997.
"Moisture Testing Guide for Wood Frame Construction Clad With Exterior Insulation and Finish Systems (EIFS)", 31 pages, from www.toolbase.org/Docs/MainNav/MoisutreandLeaks/876_protocol5A.pdf?TrackID=&CategoryID=1013&TrackID=876, Aug. 4, 1998.
"Testing Housing Materials for Moisture", 2 pages, from www.extension.umn.edu/info-u/household/BK270.html, Copyright 1998.
Data and brochure sheets for the Quest Technologies Indoor Air Quality Monitors models aq-5000 and aq-5001. A brief summary of the devices can be found at the following web site addresses: http://www.quest-technologies.com/AQ/aq5000.htm and http://www.quest-technologies.com/IAQ/aq5001.htm.
ASTM, (1998), D4444-92e1 Standard Test Methods for Use and Calibration of Hand-Held Moisture Meters, American Society for Testing and Materials, abstract obtained from http://alcor.concordia.ca/~raojw/crd/reference/reference000784.html.
"Indoor Air Quality Monitors", Quest Technologies PDF Brochure for Model AQ 5000 Hand Held IAQ Monitor and Model AQ 5001 Portable IAQ Monitor, Rev. A, Apr. 2000.
Decision on Appeal dated Apr. 25, 2012 in related U.S. Appl. No. 10/621,860.
"Solutions—Munters Keeps Construction Projects on Schedule!", Munters 2000/2001.
"Preventing Mold by Keeping New Construction Dry", Harriman, Schnell & Fowler, pp. 28-34, ASHRAE Journal, Sep. 2002.
"Construction Drying", Munters, Oct. 2000 (Oct. 2000).
"Using Desiccant Technology to End Moisture Nightmare on Construction Projects", Munters, Feb. 21, 2002 (Feb. 21, 2002).
Willis, "Creating a Little Desert Indoors—Dehumidifiers Speed Up Finish Work Inside NW Buildings", Jun. 1, 2000, Daily Journal of Commerce.
Munters, "Case Study—Construction Drying: Mold and Mildew Protection Project Yields Multiple Benefits Round Rock, Texas", Mar. 2002.
Harriman et al., "Preventing Mold by Keeping New Construction Dry", ASHRAE Meeting, Jan. 2003, Chicago, IL.
Archive Press Release, "Munters New HCU Product Allows Dehumidity Control Independently of Temperature Control", http:/News.thomasnet.com/fullstory/7783, Mar. 8, 2002.
U.S. Appl. No. 60/453,856, filed Mar. 12, 2003 by Peng Lee et al.
Stolowitz Ford Cowger LLP, "Listing of Related Cases", Jun. 2, 2015, 1 page.

* cited by examiner

**EXHIBIT C**
**Page 2 of 7**

U.S. Patent                    Mar. 19, 2019                    US 10,234,200 B2



EXHIBIT C
Page 3 of 7

US 10,234,200 B2

1

## MOISTURE REDUCTION AND MOLD AND MOISTURE DAMAGE PREVENTATIVE SYSTEM AND METHOD IN CONSTRUCTION

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a Divisional of U.S. patent application Ser. No. 14/035,292, filed Sep. 24, 2014, which is a Continuation of U.S. patent application Ser. No. 10/621,859, filed Jul. 16, 2003, now U.S. Pat. No. 8,567,688, issued Oct. 29, 2013, the contents of which are herein incorporated by reference in their entireties.

### BACKGROUND OF THE INVENTION

This invention relates to buildings and construction, and more particularly to controlling moisture to reduce the likelihood of mold growth and moisture damage.

Mold and mildew problems in buildings are becoming more common, and can lead to substantial remediation efforts, with associated costs or litigation.

In building construction, whether commercial or single or multiple family residential, problems can arise if a particular level of moisture remains in walls at the time the walls are sealed. During construction, these buildings are typically wet, either from rain/snow or from wet construction materials being used, for example, wet wood, or materials that are applied in a wet state and then need to dry. Mold will typically grow in wood or other construction material when there is sufficient moisture present, for example, above 20% moisture in Douglas fir.

Mold spores can grow if sufficient moisture is sealed into construction material and there is an available food source. Should mold develop, it is often detected immediately, or sometimes such detection is delayed. In some cases, it is never detected.

Mold remediation, such as removal and prevention of future growth, is costly and time consuming. The existence of mold in a construction project can cause public relations issues, wherein the builder or project developer can be equated with the bad publicity related to the mold issues. Still further, legal issues can arise, related to the costs and delay of remediation, alleged health issues from occupants of the affected buildings, and contractual disputes arising over purchase or lease of the affected property, as a purchaser might wish to cancel a property transaction based on the mold issues.

Apart from mold issues, the presence of moisture alone can also lead to damage to structures and materials, resulting in costly remediation with corresponding issues to those noted hereinabove with respect to mold.

Financing and monetary requirements demand that structures be built as quickly as possible, to minimize the duration of construction financing, for example, and to increase construction-related revenue. Such time constraints result in framing being covered up as quickly as possible. These time constraints do not allow a builder to have a partially completed structure sit for weeks to allow any moisture in the construction materials to naturally reach equilibrium with its environment, and this increases the likelihood that wet materials may be sealed up, leading to a higher likelihood of mold growth or moisture damage occurring. Depending on climate factors, the business cycle of construction may not allow sufficient time for waiting for the natural drying process.

2

In particular in new construction, building practices resulting in an energy efficient structure may severely restrict airflow between the interior and exterior of a structure, resulting in trapping of moisture inside the structure. This can increase the likelihood of mold or moisture problems in structures today.

Heretofore, the issue of mold has been addressed as an afterthought in reactive fashion, only being tackled when mold appears, advising cleaning up mold quickly when it appears, for example.

### SUMMARY OF THE INVENTION

In accordance with the invention, a system and method is provided for removing moisture from a construction project, to ensure sufficiently low moisture content is present in the construction before it is sealed.

Accordingly, it is an object of the present invention to provide an improved method for reducing moisture in construction projects below a desired level.

It is a further object of the present invention to provide an improved system for removing moisture from construction projects.

The subject matter of the present invention is particularly pointed out and distinctly claimed in the concluding portion of this specification. However, both the organization and method of operation, together with further advantages and objects thereof, may best be understood by reference to the following description taken in connection with accompanying drawings wherein like reference characters refer to like elements.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of the process according to the present invention.

### DETAILED DESCRIPTION

The system according to a preferred embodiment of the present invention comprises a system and method for reducing moisture content in a building or portion of a building under construction, wherein said reduction is made as a curative and preventative measure that takes place at a specific phase in the construction process.

Referring now to FIG. **1**, which is a block diagram of the moisture reduction process according to the present invention, the system and method are typically employed, in the case of construction, after the roof, windows and doors are installed and before the so called finish trades (wall board, insulation, cabinetry, etc.) are done. When a decision to take the preventative measure has been made, initial readings of moisture content of construction materials, relative humidity and temperature are taken in the building under test (step **12**). These measurements are made to determine how to effect moisture removal in the building and may be made, for example, with a GE Protimeter MMS Plus model by GE Protimeter, 500 Research Drive, Wilmington, Mass., US, or the Tramex Moisture Meter, from Tramex Ltd. of Dublin, Ireland moisture meter in particular embodiments.

Next, in step **16**, a determination is made based on the results of the readings, whether preventative moisture removal is warranted. For example, if moisture content of Douglas fir is below 20% moisture content, moisture removal treatment may not be needed. If further treatment is not needed, then the process is complete at block **18**. However, if further treatment is deemed advisable, then the

EXHIBIT C
Page 4 of 7

**3**

process continues to block **20**, wherein moisture reduction equipment is placed within the space that is to be treated. The specific moisture reduction equipment employed can vary based on the moisture removal needs of the structure, but typically will include air moving equipment, such as blowers, for circulating the air within the space, dehumidifiers to extract the moisture from the air and either contain it within the dehumidifier or dispose of it external to the space (by a drain tube, for example). Additionally, heating equipment may be employed, to raise the temperature within the space to increase the speed of moisture removal.

Examples of typical equipment that may be employed in the system and performing the method is as follows:

Blower: An electric portable blower that provides a continuous, high velocity airflow, such as model #797 Ace TurboDryer, from Dri-Eaz of Burlington, Wash., US, or the Dri-Eaz Santana SX model turbodryer, or the Gale Force air mover by Dry Air Technology of Burlington, Wash.

Dehumidifier: #721 DrizAir 1200, by Dri-Eaz of Burlington, Wash., US. This is a refrigerant dehumidifier which provides a 15 gallon per day maximum moisture removal output level, while drawing 6.4 amps current at 120V. Also, the DrizAir 2000, a 25 gallon per day model can be employed. Alternatively, a DriTec desiccant dehumidifier may be employed, which uses silica gel to adsorb moisture from the air, manufactured by Dri-Eaz of Burlington, Wash.

Heater: portable heaters, such as propane/natural gas powered heaters, such as the Dri-Eaz K85 mobile furnace, by Dri-Eaz of Burlington, Wash., US.

In a typical installation, four or five blowers or fans will be grouped together with one dehumidifier and heater in a given space.

Depending on the particular characteristics of the space being treated, openings into other rooms or other parts of a building are sealed off with some sort of vapor barrier (for example, plastic sheeting in roll form and duct tape to seal the sheeting to close off the opening). Also, window or door openings that do not yet have the windows or doors installed may be sealed in corresponding fashion.

Once the equipment is in place, the blowers and dehumidifier are activated (and heaters, if present) and they are allowed to run for a period of time (block **22**), typically a 24 hour period, whereupon further moisture readings are taken (block **24**) to track the progress of moisture removal. At decision block **26**, a determination is made whether sufficient moisture has been removed from the space. If not, then the equipment is allowed to continue to operate. Optionally, the equipment may be moved around to different locations within the space being treated (block **28**). The process loops back to allow the passage of time at block **22**, and the time/readings/determine whether acceptable moisture content reduction has occurred cycle continues until the result of the decision block **26** is that yes, the moisture content has been reduced to an acceptable level (for example, 20% or lower moisture content). Then the moisture removal process is completed and the equipment is removed (block **30**).

A typical time between the initial placement of the equipment and determination that the space has a sufficiently low moisture content level is 4 to 7 days. Of course this depends on a number of factors, including the initial moisture content of the space, the capacity of the moisture control equipment that is installed, and relative humidity and temperature, for example.

Some other possible variations in the process can occur. For example, if at block **24**, when further readings are taken after the passage of time, it is determined that the moisture level is not being reduced (or is not being reduced at a

**4**

sufficient rate), then additional blower/dehumidifier/heating equipment may be added. Further, if after a passage of time, the moisture levels are not reducing in a desired fashion, this typically indicates that moisture is leaking into the space from an outside source (for example an improperly installed roof is leaking) and investigation of the source of the moisture should be made.

Examples of application of the system and method are given below. The measurement goal for all tests in these particular examples is 18% moisture content:

### Example 1

New construction, 1500 square feet.

Day 1, temperature 71.5.degree. F., 36.7% relative humidity. 2 measurements were taken low along wall studs, giving 16 and 18% moisture content. 4 measurements were taken high along wall studs, giving 16, 24, 21 and 21%.

Moisture removal equipment was installed and allowed to run for the rest of day 1. On day 2, temperature was 64.7.degree. F., 46.9% relative humidity. 2 measurements were taken low along wall studs, giving 16 and 18% moisture content. 4 measurements were taken high along wall studs, giving 16, 18, 18 and 18% moisture content. The moisture removal operation was judged completed.

### Example 2

New construction, 2200 square feet.

Day 1, temperature 69.4.degree. F., 49.1% relative humidity. 7 measurements were taken low along wall studs, giving 25, 20, 25, 25, 15, 25 and 22% moisture content. 7 measurements were taken high along wall studs, giving 21, 19, 25, 25, 25, 25 and 25%.

Moisture removal equipment was installed and allowed to run. On day 2, temperature was 65.1.degree. F., 55.3% relative humidity. 7 measurements were taken low along wall studs, giving 20, 17, 25, 25, 20, 21 and 20% moisture content. 7 measurements were taken high along wall studs, giving 22, 18, 23, 23, 15, 21 and 20% moisture content. The moisture removal operation was continued, and then further measurements were taken on day 3. 6 lower level measurements of 20, 18, 18, 18, 15 and 21% moisture content were taken, and 7 upper level measurements of 18, 17, 20, 23, 18, 18 and 20% were recorded. Moisture removal was continued and on day 4, 7 measurements were taken at both lower and upper levels, resulting in: lower 18, 18, 18, 18, 15, 18, 17; and upper 16, 16, 17, 16, 18, 16, 15. The moisture removal operation was judged completed at this state.

### Example 3

New construction, 2300 square feet.

Day 1, temperature 63.2.degree. F., 38.0% relative humidity. 7 measurements were taken low along wall studs, giving 15, 20, 15, 15, 30, 30, and 16% moisture content. 7 measurements were taken high along wall studs, giving 30, 30, 30, 18, 25, 24 and 20%.

Moisture removal equipment was installed and allowed to run until day 2, when further measurements are made, temperature was 80.2.degree. F., 29.5% relative humidity. Measurements low along wall studs were 15, 15, 15, 15, 20, 15 and 16% moisture content. High location measurements were 25, 20, 25, 18, 23, 20 and 20% moisture content. The moisture removal operation was continued until day 3, when measurements as follows were judged to have sufficiently

EXHIBIT C
Page 5 of 7

US 10,234,200 B2

5

accomplished the desired moisture removal: low, 15, 15, 15, 15, 18, 15, 16%; and high 18, 17, 18, 18, 16, 15, 18%.

Example 4

New construction, 1500 square feet.

Day 1, temperature 68.8.degree. F., 43.0% relative humidity. 4 measurements were taken low along wall studs, giving 21, 18, 15 and 17% moisture content. 7 measurements were taken high along wall studs, giving 15, 25, 25, 21, 16, 15 and 18%.

Moisture removal equipment was installed and allowed to run. On day 2, when further measurements are made, temperature was 58.4.degree. F., 59.4% relative humidity. Measurements low along wall studs were 18, 18, 15 and 17% moisture content. High location measurements were 15, 18, 18, 17, 16, 15 and 18% moisture content. This was sufficient moisture removal to complete the operation.

Example 5

New construction, 2150 square feet.

Day 1, temperature 57.4.degree. F., 97.4% relative humidity. 7 measurements were taken low along wall studs, giving 20, 15, 20, 21, 40, 18 and 16% moisture content. Measurements taken high along wall studs were 20, 20, 23, 40, 22, 17 and 30%.

Moisture removal equipment was installed and allowed to run until day 2, when further measurements are made, temperature was 67.0.degree. F., 47.9% relative humidity. Measurements low along wall studs were 15, 15, 15, 15, 18, 18 and 16% moisture content. High location measurements were 15, 15, 18, 16, 15, 17 and 17% moisture content. This was a sufficient moisture level to complete the operation.

Example 6

New construction, 2500 square feet.

Day 1, temperature 68.0.degree. F., 36.6% relative humidity. 7 measurements were taken low along wall studs, giving 13, 11, 12, 11, 11, 13 and 10% moisture content. Measurements taken high along wall studs were 12, 11, 13, 10, 12, 13 and 11%.

Since all measurements were below the target level, no moisture removal was performed as the area was already at a sufficiently low moisture content.

In making measurements, any wood surfaces are measured, but typically moisture content measurements are made at base plates, studs and floors. It is not necessary to measure every stud in the structure, because if a stud with moisture content above the moisture threshold is detected in an area, then moisture removal will be performed in the area, so it isn't required to keep measuring at that point. Thus, for example, if the first set of measurements taken is beyond the acceptable moisture threshold, taking additional measurements is not necessary, but can be completed if desired, to provide historical data for comparison when the moisture removal is completed, and more measurements might be taken to further show overall moisture levels. Thus, in performing the process, typically moisture content tests are made throughout the structure, but moisture removal is only needed to be done in those areas where the moisture content level is too high.

Thus, in accordance with the system and method, a preventative moisture removal is accomplished to bring the moisture content level within a space to a desired level below that which would support mold growth, to reduce the

6

likelihood that mold or moisture damage problems will arise in the finished construction. Should mold or moisture damage problems arise later, however, the builder has useful information to help locate the cause of the mold growth or moisture damage, as it is known from the use of the system and method that at a crucial point in the construction process, the moisture content level had been reduced sufficiently to prevent such growth or water damage. This information can help in determining what party might bear the responsibility for costs involved in mold or moisture damage remediation procedures. It can also assist in determining the construction stage at which a mold infestation or moisture entry took place.

While in the preferred embodiment, the moisture content level of 20% is a desired threshold, applied to Douglas fir wood, for example, below which the moisture content is desirably reduced, and while 18% was given as the threshold level in the illustrative examples herein, different levels may be appropriate in other types of wood and in other materials such as engineered woods (oriented strand board, plywood, fiberboard, etc.), wallboard or other materials.

While a preferred embodiment of the present invention has been shown and described, it will be apparent to those skilled in the art that many changes and modifications may be made without departing from the invention in its broader aspects. The appended claims are therefore intended to cover all such changes and modifications as fall within the true spirit and scope of the invention.

We claim:

1. A process for treating a wood frame within a space located in new construction before wall board is applied to said frame in order to prevent structural damage and/or the growth of mold or mildew, comprising the steps of:

measuring moisture content of the wood frame using a moisture meter within a plurality of locations within said space;

determining whether the measured moisture content meets a threshold indication recommending that drying be performed;

placing least one drying device in communication with said space and operating it for the purpose of reducing the moisture level of said frame, wherein the at least one drying device is selected from the group consisting of a dehumidifier, a space heater, and an air moving device; and

further comprising the step of placing at least one vapor barrier between said space and other space located within said new construction.

2. The process according to claim 1, wherein said at least one drying device is a dehumidifier and is operated for a period of time, whereupon one or more further moisture content readings are taken, and a decision is made whether to continue operating said dehumidifier based on whether said one or more further moisture content readings meet the threshold indication.

3. The process according to claim 1, wherein said plurality of locations within said space include locations on the surface of said wood frame.

4. The process according to claim 3, wherein said plurality of locations include high and low locations.

5. The process of claim 1 wherein at least one drying device is located within said space.

6. The process of claim 1 further comprising the step of changing the location of said at least one drying device following a period of operation of said device.

7. The process of claim 1 further comprising the step of again measuring moisture content of the wood frame using

EXHIBIT C
Page 6 of 7

US 10,234,200 B2

7

8

a moisture meter within a plurality of locations within said space following a period of operation of said at least one drying device.

8. The process of claim **1**, wherein the space comprises one or more rooms of said new construction, and wherein the one or more rooms are substantially sealed relative to other rooms of said construction.

9. The process of claim **1**, further comprising the step of adding at least one additional drying device following a period of operation of said at least one drying device.

\* \* \* \* \*

EXHIBIT C
Page 7 of 7